**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO. _____** |
| | ) | |
| **v.** | ) | **JUDGE** |
| | ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, Administrator,** | ) | **MAG. JUDGE** |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Denka Performance Elastomer, LLC ("DPE") alleges as follows:

**<u>INTRODUCTION</u>**

1.      This action for declaratory and injunctive relief against the United States Environmental Protection Agency ("EPA," or the "Agency") and EPA Administrator Michael S. Regan is intended to achieve one fundamental objective: to address EPA's violations of the Administrative Procedure Act ("APA") when the Agency sought, and then repeatedly ignored, the best available scientific information in imposing air pollution control requirements for a chemical called chloroprene.  In assessing the potential risks of chloroprene for the past roughly dozen years, EPA has often stressed the importance of considering and applying the best available science on risk assessment.  However, in actually *setting* risk-based requirements for chloroprene, EPA has refused to consider what the Agency *admits* is the best available scientific information.  EPA's reason?  The Agency simply declares that it is not a priority and that it has no obligation to do so.  EPA is wrong.  In this case, EPA's denial of a request that EPA use the best available science on

the potential risks of chloroprene to humans—and set appropriate risk-based requirements for chloroprene based on that science—was arbitrary, capricious, and an abuse of discretion, and was not in accordance with law, in violation of the APA.

2.      EPA's repeated refusal to consider the best available scientific information on the potential risk of chloroprene is having real world consequences.  DPE operates a manufacturing facility in La Place, Louisiana (the "Facility") that uses chloroprene to produce Neoprene, a popular synthetic rubber that is used in a wide array of products, including cars, adhesives, medical devices, wetsuits, and other applications.  The Facility is the only Neoprene-producing facility in the United States.  In its refusal to consider the best available science on the potential risk of chloroprene, EPA has set a *de facto* standard for chloroprene that is so stringent that it would be impracticable for the Facility to meet that requirement.  More importantly, based on the best available science, the requirement demanded by EPA is not remotely necessary to protect human health.  The best available scientific information, which EPA refused to consider at the time, plainly demonstrated that EPA has dramatically overstated the risk of chloroprene to human health and that far less stringent requirements for chloroprene would be fully protective of human health.

3.      Worse still, EPA *encouraged* DPE to develop the latest available scientific information and, over a multi-year period, actively collaborated with DPE in ensuring that such scientific information was complete, accurate, and up-to-date.  When DPE, through substantial effort and expense, developed that scientific information, went through two rounds of peer review overseen by EPA, and presented it to EPA, the Agency abruptly reversed course and said it had no obligation to consider the latest scientific information.  Why would EPA do this?  Upon information and belief, EPA has taken this inconsistent position because EPA leadership is seeking to satisfy environmental activists and plaintiffs' lawyers who have brought multiple lawsuits based

2

on outdated scientific information that dramatically overstates the risk of chloroprene.  To be very clear, DPE strongly supports effective environmental protection for the Facility's neighbors.  It is undisputed that, just since January 2017, DPE has reduced chloroprene emissions from the Facility by 85 percent at a cost to DPE of more than $35 million.  However, rather than using the best available science to assure the Facility's neighbors that current levels of chloroprene emissions do not pose a meaningful risk to human health, EPA appears to be following a politically driven strategy to support the demands made by environmental activists and plaintiffs' lawyers.  This strategy has led EPA to disregard the best available science in order to catalyze permitting, enforcement, rulemaking and other actions premised on a more stringent—and undisputedly outdated—determination of the potential risks of chloroprene to humans.  Upon information and belief, EPA refused to consider the best available scientific information on the risks of chloroprene to humans—information that EPA *encouraged* DPE to generate—predominantly because that information is inconsistent with EPA's politically expedient strategy.

## THE PARTIES

4.      Plaintiff DPE operates the Facility.

5.      Defendant EPA is the federal agency charged with disseminating accurate information reflecting best available science concerning the toxicity of chloroprene under the Information Quality Act, Section 515 of Pub. Law 106-554 (2000), codified as 44 U.S.C. §§ 3504(d)(1) and 3516, the administration of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*., and the administration of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq*.

6.      Defendant Michael S. Regan is the Administrator of EPA.  Administrator Regan's office is located at 1200 Pennsylvania Avenue, NW, Washington D.C. 20530.  Administrator

Regan is responsible for supervising the activities of EPA, including the actions at issue in this Complaint.  He is being sued in his official capacity.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because DPE's claims arise under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

8.      The relief sought herein is authorized by 5 U.S.C. §§ 704, 706(2) and 28 U.S.C. §§ 2201-02.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because the acts and omissions giving rise to the claims alleged herein harm only one facility in the United States—the DPE Facility—which is located within the boundaries of the U.S. District Court for the Eastern District of Louisiana.

## THE INFORMATION QUALITY ACT

10.     The Information Quality Act ("IQA"), Section 515 of Pub. L. 106-554, codified in 44 U.S.C. §§ 3504(d)(1) and 3516, and implementing guidelines issued by the Office of Management and Budget ("OMB"),[1] apply to EPA's September 2010 Toxicological Review of Chloroprene ("2010 Review") at issue here (and discussed further below) because that decision by EPA constitutes important scientific information disseminated by a federal agency.  The IQA requires that influential scientific information disseminated by EPA be of appropriate "quality,"

---

[1] *See* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8,452 (Feb. 22, 2002); Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility and Integrity of Information Disseminated by the Environmental Protection Agency ("Guidelines").   Available at https://www.epa.gov/quality/guidelines-ensuring-and-maximizing-quality-objectivity-utility-and-integrity-information.

which consists of utility, objectivity, and integrity.  The 2010 Review is subject to the most demanding requirements of OMB's and EPA's IQA guidelines because it is "influential scientific information" that "present[s] information on health effects" of chloroprene.  Under the IQA and implementing guidelines, EPA is required to incorporate a "high degree of transparency about the data and methods to facilitate the reproducibility of such information by qualified third parties." *See* OMB's Government-wide Data Quality Act Guidelines, 67 Fed. Reg. 8,452, 8,455 (Feb. 22, 2002).

11.   EPA has established an elaborate procedure to submit requests for correction ("RFCs") and appeals of decisions on RFCs through requests for reconsideration ("RFRs").  *See* Guidelines, Section 8.  The Guidelines establish substantive and procedural requirements for RFCs and RFRs.  Under Guideline 8.7, an RFR is decided by a three-member "executive panel … comprised of the Science Advisor/AA for the Office of Research and Development (ORD), Chief Information Officer/AA for OEI, and the Economics Advisor/AA for the Office of Policy, Economics and Innovation (OPEI)."  Further, as provided in Guideline 8.7, "[t]he executive panel makes the final decision on the RFR."  EPA's denial of DPE's Request for Reconsideration on October 19, 2022, described further below, was a "final" Agency action.

## FACTUAL BACKGROUND

A.   The Facility.

12.   The Facility is in St. John the Baptist Parish in Louisiana.  The Facility was originally operated by DuPont Pontchartrain Works ("DuPont") beginning in 1964.  In 1968, DuPont announced that it would begin Neoprene production at the Facility.

13.   In November 2015, DPE purchased the Facility from DuPont, and the Facility has been owned and operated by DPE since that time.

14.     Chloroprene is a key chemical used to produce Neoprene.  According to EPA data, DuPont's operation of the Facility resulted in chloroprene emissions of approximately 500 tons per year until 1986.  Between 1986 and 2015, chloroprene emissions from the Facility under DuPont's operation dropped to about 120 tons per year.  Since DPE acquired the Facility in 2015, DPE has made substantial investments to further reduce chloroprene emissions, and current chloroprene emissions from the Facility are down to approximately 18 tons per year.

15.     Since January 2017, as EPA itself has acknowledged, DPE has reduced chloroprene emissions from the Facility by 85 percent at a cost to DPE of more than $35 million.  *See* EPA Summary Report, Air Monitoring for Chloroprene Concentrations in LaPlace, LA from May 25, 2016, through July 16, 2020 at 1 ("EPA Summary Report"), available at https://www.epa.gov/la/denka-air-monitoring-data-summaries ("Since March 2018, following the implementation of emission controls being installed by DPE, chloroprene stack emissions have been reduced by 85% and EPA air monitoring data have shown corresponding significant reductions of chloroprene concentrations in the community.").

B.     EPA's 2010 Toxicological Review Of Chloroprene And Resulting IUR.

16.     EPA reviews and publishes information about the health and environment effects of industrial chemicals in its Integrated Risk Information System ("IRIS").  In its "IRIS assessments," EPA provides toxicity values for health effects resulting from exposure to chemicals.  For many chemicals, one part of this assessment is a value called "inhalation unit risk" ("IUR"), which is intended to be an estimate of the increased cancer risk from inhalation exposure to a concentration of a particular chemical of 1 $\mu g/m^3$ for a lifetime.  In theory, an IUR can be multiplied by an estimate of lifetime exposure (in $\mu g/m^3$) to estimate a person's lifetime risk of developing cancer as a result of the chemical exposure.

17.     In September 2010, EPA released the 2010 Review in support of EPA's IRIS assessment of chloroprene.[2]  In the 2010 Review, EPA concluded that chloroprene was "likely to be carcinogenic to humans" and set one of its most stringent IURs for any hazardous pollutant. Specifically, EPA calculated an IUR for human exposure to chloroprene of $5 \times 10^{-4}$ per $\mu g/m^3$ for 70-years exposure.  Based on the IUR, EPA issued a memorandum in 2016 stating that the chloroprene concentration associated with an incremental lifetime (*i.e.*, 70-year) cancer risk level of 1-in-10,000 was 0.2 $\mu g/m^3$, which EPA generally describes as the "upper limit of acceptability for purposes of risk-based decisions."[3]  As explained below, EPA's "upper limit of acceptability" does not constitute a "bright line" threshold and EPA's treatment as such, without explanation, is at sharp variance with more than 30 years of EPA risk assessment policy.  As further explained below, EPA's 0.2 $\mu g/m^3$ IUR value for chloroprene is both impracticable to meet and, based on the actual science, entirely unnecessary to protect human health and the environment.

18.     In setting that stringent 0.2 $\mu g/m^3$ IUR value for chloroprene, EPA relied upon a default assumption that humans are as sensitive to chloroprene as the female B6C3F1 mouse, which was the most sensitive animal species and gender in the laboratory experiments conducted on the effects of exposure to chloroprene.[4]  However, as multiple experts participating in the contemporaneous peer review of the 2010 Review expressly told EPA at the time, the default

---

[2]     The 2010 Review can be found at https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1021tr.pdf.

[3] *See* Memo from Kelly Rimer, Leader, Air Toxics Assessment Group, Health & Env't Impacts Div., OAQPS, to Frances Verhalen, P.E., Chief, Air Monitoring/Grants Section, EPA Region 6, Re: Preliminary Risk-Based Concentration Value for Chloroprene in Ambient Air (May 5, 2016).

[4] The B6C3F1 mouse is a hybrid strain of mouse that is produced as a cross between other specified strains of mice.

mouse IUR overestimates human sensitivity to chloroprene.  The female B6C3F1 mouse is far more sensitive to chloroprene (and other similar chemicals) than the male B6C3F1 mouse and every other type of animal that has been tested, including hamsters, Wistar rats, and Fischer rats, all of which are commonly used in laboratory studies of industrial chemicals and all of which have been utilized in laboratory experiments involving chloroprene.  For example, at any given concentration, the response and estimated risk for the female B6C3F1 mouse was from *6 to 160 times* greater than the Fischer rat.  Other rodent species showed *virtually no response to chloroprene*.  Indeed, even the male B6C3F1 mouse showed drastically lower effects from chloroprene exposure than the female B6C3F1 mouse.

19.     In short, because of the substantial toxicokinetic (*i.e.*, how the body handles a chemical, as a function of dose and time) differences between the female B6C3F1 mouse and humans—differences which EPA was aware of but did not account for in its calculation of the IUR—the 0.2 μg/m$^3$ IUR value for chloroprene dramatically overstates the human cancer risks associated with exposure to chloroprene.  Further, the most important epidemiological studies of chloroprene that were available in 2010 were studies of U.S. chloroprene workers prepared in 2007 by Dr. Gary Marsh, Ph.D.  (Marsh, et al. 2007a, 2007b).[5]  Dr. Marsh's 2007 studies involved, among other things, an analysis of chloroprene exposure at the Facility and showed no relationship between worker exposure to chloroprene and lung or liver cancer mortalities.[6]  EPA nonetheless

---

[5] *See* Marsh GM, Youk AO, Buchanich JM, Cunningham M, Esmen NA, Hall TA, Phillips ML. 2007b.  Mortality patterns among industrial workers exposed to chloroprene and other substances. II. Mortality in relation to exposure.  Chemico-Biological Interactions. 166(1-3):301-16.

[6] As discussed further below, Dr. Marsh performed a major follow-up epidemiological study in 2021, which provided an update through 2017 regarding the cohort of chloroprene workers that was the subject of Dr. Marsh's 2007 study.  The updated 2021 Marsh study showed *no increase* in cancer mortalities among U.S. chloroprene workers.  *See* Marsh GM, Kruchten A, Buchanich JM.

declared in the 2010 Review that there was "evidence of an association between liver cancer risk and occupational exposure to chloroprene" and "suggestive evidence of an association between lung cancer risk and occupational exposure to chloroprene."  2010 Review at 96.

20.     In December 2015, EPA published a National Air Toxics Assessment, or NATA, based on reported emissions from industrial facilities in 2011 ("2011 NATA").  In general, EPA uses NATAs to identify and prioritize air toxics that EPA believes contribute to health risks.  In the 2011 NATA, EPA relied upon on the IUR for chloroprene from the 2010 Review—*i.e.*, the chloroprene risk assessment based solely on the female B6C3F1 mouse—as well as on data regarding chloroprene emissions from the Facility during 2011 and other data.  In the 2011 NATA, EPA suggested that there was a high risk of cancer due to chloroprene exposure in St. John the Baptist Parish in the vicinity of the Facility.  Indeed, EPA stated that "[t]he top 5 census tracts with the highest NATA-estimated cancer risks *nationally* are in Louisiana due to Denka (formerly DuPont) chloroprene emissions."[7]

C.     The 2010 Review Was Scientifically Flawed And EPA Knew It.

21.     EPA's conclusions in the 2010 Review are scientifically flawed.  Prior to issuing the 2010 Review, EPA consulted with a group of experts in toxicology[8] and epidemiology[9] to

---

Mortality Patterns Among Industrial Workers Exposed to Chloroprene and Other Substances: Extended Follow-Up. J Occup Environ Med. 2021 Feb 1;63(2):126-138.

[7]  EPA, LaPlace, Louisiana – Frequent Questions (Mar. 29, 2022), available at https://www.epa.gov/la/laplace-louisiana-frequent-questions (emphasis added).

[8]  The National Institutes of Health ("NIH") describes toxicology as a field of science that helps us understand the harmful effects that chemicals, substances, or situations, can have on people, animals, and the environment.

[9]  NIH defines epidemiology as the branch of medical science that investigates all the factors that determine the presence or absence of diseases and disorders.

conduct a peer review of the 2010 Review.  These experts included Dr. Herman J. Gibb, Ph.D., M.P.H., an epidemiologist; Dr. Avima M. Ruder, Ph.D., an epidemiologist; Dr. Ronald L. Melnick, Ph.D., a toxicologist; Dr. John B. Morris, Ph.D., a toxicologist; Dr. Richard B. Schlesinger, Ph.D., a toxicologist; and Dr. Dale Hattis, Ph.D., a statistician.  Notably, EPA believes that the 2010 "peer review is presumptive of objectivity and 'best available' science at the time it was developed." Letter from Dr. Maureen R. Gwinn to Mr. Patrick Walsh at 1 (Mar. 14, 2022) ("2022 RFR Denial").

22.     The peer review of the 2010 Review raised sharp criticisms of EPA's methods and conclusions in the 2010 Review.  Four of the six peer reviewers raised concerns that basing human risk values on the female B6C3F1 mouse would overestimate chloroprene's cancer risk to humans. For example, Dr. Morris, a toxicologist, stated that "[i]t is my view that the mouse lung data may overestimate the risk to humans.  It is recognized that exclusion of these data may be problematic, but *at a minimum* a discussion of this weakness should be provided.  Because the metabolism rates in the rat appear similar to the human, the rat may offer a better species for prediction of human health risks."  Final Reviewer Comments, External Peer Review Meeting on the *Toxicological Review of Chloroprene*, at 30 (Jan. 26, 2010) ("2010 Final Reviewer Comments") (emphasis added).  Dr. Ruder, an epidemiologist, observed that "[t]he text in [the 2010 Review] explains the derivation of the inhalation risk but does not explain why inhalation in mice was chosen over inhalation in rats from the same study.  I assume there are physiological differences which make mice a more suitable choice, *but none were provided here.*"  *Id.* at 31 (emphasis added).  Similarly, Dr. Schlesinger, a toxicologist, warned that EPA "may want to consider the fact that metabolic activation rate in the rat is closer to that occurring in humans than is the situation in mice."  *Id.*

23.     Most of the peer reviewers recognized the need to adjust the IUR for the female B6C3F1 mouse to reflect human sensitivity.  Dr. Morris, a toxicologist, provided several sharply worded comments recognizing the important differences between human response and the response of the female B6C3F1 mouse:

- "[I]n my view, some skepticism is appropriate relative to the quantitative importance of mouse bronchiolar tumors.  The mode of action includes metabolic activation as the first step.  The metabolic activation rates in the mouse exceed those in other species by 50-fold.  . . . The large differences in mouse vs. human relative to pulmonary activation raise questions as to the relevance of the mouse lesions.  At the very least, this issue needs to be discussed.  Exclusion of the mouse lung tumors would influence the final overall unit risk estimate indicating this is not a trivial concern."  2010 Final Reviewer Comments at 40.

- "The mouse – human comparison for lung metabolism is particularly important, a fact that was not adequately considered in the risk evaluation.  The presented data indicate the activity in human lung is 50-fold lower than in mouse lung . . . .  The liver activities in the mouse and man are much more similar.  Since metabolic activation is the first step in the mode of action and lung tumors in mice drives the risk extrapolation, this comparison becomes particularly important. . . .  [T]his type of species difference (mouse to human pulmonary metabolism) is hardly unique to chloroprene.  For example, consider styrene."  *Id.* at 47.

- "More detail should be provided on the metabolism kinetics for chloroprene. . . .  The relative level of metabolite 1 in the humans was approximately 10-fold lower than the F344 rat and mouse. The level of metabolite in the Wistar rat and hamster was lower as well.  Were these quantitative differences synthesized into a coherent explanation of species differences in response?"  *Id.* at 57.

- "This section fails to include the most important species difference – the appearance of lung tumors in mice but not rats.  An in situ [sic] pulmonary metabolic basis might be provided, given that the metabolic activation rate in mice appears to be 50-fold higher than the rat but that in the liver differs by only 2-fold."  *Id.* at 59-60.

- "[M]agnitude of species difference in metabolism is not unique, consider styrene or naphthalene.  One might convincingly argue that the enormous metabolic activation rate in the mouse coupled with the low epoxide hydrolysis rate renders this species inappropriate relative to extrapolation of lung tumors.  The authors of the [2010 Review] may not agree, but a

critical discussion and rationale for using the mouse data needs to be included." *Id.* at 62.

24.     Notably, panel members emphasized that EPA should develop and utilize a physiologically-based pharmacokinetic ("PBPK") model, which is a specialized computer model that is specifically designed to make adjustments in risk assessments based upon the different toxicological effects of a chemical from one species to another—for example, the differences between a female B6C3F1 mouse and a human.  Panel members emphasized that a PBPK model for chloroprene would allow EPA to interpret laboratory animal tumor incidence data and apply that data to human beings, while considering the significant physiological differences between mice, rats, and humans.  For example, Dr. Morris, a toxicologist, stated: "[T]he toxicokinetic data is not adequately synthesized in the overall mode of action relative to potential species differences and extrapolation to man.  PBPK modeling would be a highly appropriate way to incorporate kinetic data into the risk assessment." *Id.* at 6.

25.     In sum, the peer reviewers of the 2010 Review raised substantial concerns that the IUR applicable to the female B6C3F1 mouse was decidedly inappropriate for assessing the risks of chloroprene exposure to humans, and that EPA should actively develop a PBPK model to correctly assess how animal risk studies translate into potential human risk.

26.     In light of these criticisms by the 2010 peer reviewers, EPA should have reexamined its myopic reliance on the tumor incidence rate in the B6F3C1 female mouse and either based its cancer risk assessment on the tumor incidence rate in the rats (as several peer reviewers suggested) or pursued the development of a PBPK model.  But EPA rejected the chloroprene PBPK model that was available at that time, concluding that the model was not adequate for certain technical reasons.  As explained below, although EPA subsequently encouraged DPE to develop an improved PBPK model, which DPE did in consultation with EPA,

EPA ultimately refused to consider that new and improved PBPK model—not because of any shortcoming in the new PKBK model, but because EPA, under a new Administration, now took the position that the Agency was *not required* to consider the latest and best available science on chloroprene.

27.     The 2010 peer review also strongly criticized EPA's misuse of the relevant epidemiological data in the 2010 Review.  Dr. Gibbs, one of only two epidemiologists conducting the 2010 peer review, concluded that EPA "grossly misrepresents the evidence."  Referring to EPA's reliance on prior epidemiological studies in Kentucky, Louisiana, China, Russia, and Armenia, Dr. Gibbs stated: "The statement [by EPA] … that there is evidence of a dose-response relationship in different cohorts in different continents (U.S., China, Russia, and Armenia) grossly misrepresents the evidence."  2010 Final Reviewer Comments at 25.  For example, Dr. Gibbs explained that high alcohol consumption in Russia and wide prevalence of Hepatitis B in China— both known risk factors for liver cancer mortality—were "confounding factors" that undermined the connection between chloroprene and cancer risk.  *Id.* at 27.

28.     Dr. Gibbs also criticized EPA's attempt to justify its decision not to rely on more robust existing epidemiological studies of chloroprene workers in the United States and the United Kingdom, in particular a leading epidemiological study of U.S. chloroprene workers prepared by Dr. Gary Marsh, Ph.D., in 2007.  EPA discounted these studies because it believed that the so-called "healthy worker effect" accounted for the lack of connection between chloroprene exposure and cancer risk.  EPA explained that the healthy worker effect "tends to reduce the association between an exposure [chloroprene inhalation] and the outcome [cancer mortality] because workers, as a group, are healthier than the general population comparison groups."  2022 RFR Denial, App. A, EPA Courtesy Technical Review of New Scientific Information Presented in RFC

21005, at 8.  EPA used its theory on the healthy worker effect selectively to disregard existing studies that suggested that chloroprene posed little to no additional cancer risk.  Dr. Gibbs noted in his peer review comments that "[a]n association between liver cancer and chloroprene exposure . . . is not evidence in the summary of the overall weight of evidence . . . . Furthermore, a healthy worker effect for liver cancer?  With such a short life expectancy following diagnosis, I would expect the healthy worker effect for liver cancer to be minimal if it even exists."  2010 Final Reviewer Comments at 27.  Finally, referring to Dr. Marsh's 2007 study of chloroprene workers in Louisville, Kentucky, Dr. Gibbs noted that "[t]he largest and what appears from the [draft 2010 Review] to be the best conducted study (Marsh et al., Louisville cohort) provides little if any evidence that a liver cancer risk exists.  Furthermore, the [draft 2010 Review] has not been transparent in its reasoning that there is a risk of liver cancer."  *Id.*

29.     EPA did not respond to Dr. Gibb's peer review comments by revisiting its analysis of the existing epidemiological studies or reconsidering its own analysis of the available data. Instead, EPA reiterated its conclusion that chloroprene exposure results in liver cancer while making only superficial changes to the text of the 2010 Review.

D.     DPE's Initial Request For Correction And EPA's Denial Of That Request.

30.     On June 26, 2017, DPE submitted a Request for Correction ("2017 Request for Correction") to EPA, identifying the above-described errors in the 2010 Review and IUR.  Further, DPE provided EPA with a published version of a PBPK model for chloroprene (Yang, et al., 2012). DPE also provided EPA with a substantial re-evaluation of Dr. Marsh's 2007 epidemiological study of U.S. chloroprene workers, which, as noted above, was described by one of the 2010 peer reviewers (Dr. Gibbs) as "[t]he largest and what appears from the document to be the best conducted study" of chloroprene risks.  2010 Final Reviewer Comments at 27.

14

31.     Further, DPE's 2017 Request for Correction identified data from the Louisiana Tumor Registry indicating that St. John the Baptist Parish, where the Facility is located, recorded one of the lower cancer rates of any parish in the state.  The Louisiana Tumor Registry, maintained by the Louisiana State University School of Public Health, has a mission "[t]o collect and report complete, high-quality, and timely population-based cancer data in Louisiana to support cancer research, control, and prevention."  LSU Health, *About the Registry*, https://sph.lsuhsc.edu/louisiana-tumor-registry/about-the-registry/.

32.     On January 25, 2018, EPA denied DPE's 2017 Request for Correction on the grounds that, according to EPA, DPE had not provided any new scientific information that would alter the Agency's assessment of the risks of chloroprene to humans.  In the denial, EPA stated repeatedly that in the absence of new scientific evidence, EPA would continue as a default to rely on the female B6C3F1 mouse's sensitivity to chloroprene exposure in setting the human IUR for chloroprene.  EPA did acknowledge the importance of a PBPK model in assessing the risks of chloroprene to humans but concluded that the then-existing model was not sufficient due to technical issues.

33.     On July 23, 2018, DPE filed a request for reconsideration ("2018 Request for Reconsideration") of EPA's denial of the 2017 Request for Correction.

E.     With EPA's Support And Active Collaboration, DPE Develops A New PBPK Model.

34.     In addition to filing the 2018 Request for Reconsideration, DPE embarked on a three-year project to develop an updated and peer reviewed PBPK model for chloroprene, employing a team of scientists at Ramboll US Consulting, Inc. ("Ramboll").  DPE did so to respond to EPA's conclusion in the 2018 denial of the 2017 Request for Correction that any challenge to the IUR must be based on new scientific evidence, and specifically to respond to

EPA's acknowledgement that it would be appropriate for EPA to rely upon a new and improved PBPK model for chloroprene.

35.    Indeed, DPE and EPA actively coordinated to develop a new and improved PBPK model for chloroprene.  Ramboll prepared a work plan for the development of a PBPK model and, in April 2018, provided the draft work plan to EPA for its review and comment.

36.    On information and belief, EPA committed substantial resources to provide Ramboll with quality assurance guidance on the development of the PBPK model.  EPA even paused its review of DPE's 2018 Request for Reconsideration for more than two years to accommodate Ramboll's development of the new and improved PBPK model.  At the very least, by pausing its review of DPE's 2018 Request for Reconsideration, EPA acknowledged the clear value of DPE developing a new and improved PBPK model to assess the potential risks of chloroprene to humans.  Indeed, in meetings and emails between EPA and DPE/Ramboll, EPA personnel repeatedly emphasized that DPE and Ramboll should develop the PBPK model.

37.    In June 2019, to ensure that the new PBPK model was correct, Ramboll submitted the PBPK model for publication in the peer-reviewed journal Inhalation Toxicology, and after peer review, the PBPK model was published in January 2020.[10]

38.    In October 2020, *EPA itself* sponsored another peer review of an updated version of the Ramboll PBPK model.  The 2020 peer review panel provided comments.  By early 2021, Ramboll had substantively revised the PBPK model to address all the meaningful comments from the EPA-sponsored peer review.

---

[10] Clewell HJ 3rd, Campbell JL, Van Landingham C, Franzen A, Yoon M, Dodd DE, Andersen ME, Gentry PR. 2020, *Incorporation of in vitro metabolism data and physiologically based pharmacokinetic modelling in a risk assessment for chloroprene*, Inhalation Toxicology. 31(13-14):468-483.  Located at https://pubmed.ncbi.nlm.nih.gov/31992090/

39.     In February 2021, EPA notified DPE that it would be resuming its review of DPE's 2018 Request for Reconsideration.  By that time, with EPA's input and collaboration, including the October 2020 EPA-sponsored peer review, Ramboll had substantially updated the PBPK model for chloroprene in accordance with EPA's quality assurance comments at each stage of the development process.  As such, DPE elected to withdraw its pending 2018 Request for Reconsideration.  Having now developed (with EPA's cooperation and consultation) the very new scientific information that EPA had said was necessary, DPE was prepared to submit a new request for correction of the 2010 Review that would, among other things, highlight the new scientific information that was now available in the form of the Ramboll PBPK model for chloroprene.

F.     DPE's Second Request For Correction.

40.     On July 15, 2021, DPE filed its second Request for Correction ("2021 Request for Correction") requesting correction of the chloroprene IUR based, in part, on Ramboll's new and improved PBPK model for chloroprene.

41.     Surprisingly, given EPA's prior cooperation and quality assurance input in the development of the new PBPK model, almost immediately after DPE submitted the 2021 Request for Correction, EPA personnel abruptly ceased all substantive communications with DPE regarding the new PBPK model or any appropriate revisions to the IUR based on that model.

42.     However, unbeknownst to DPE, EPA sponsored another independent peer review of the new Ramboll PBPK model for chloroprene.  Unlike the 2020 EPA-sponsored peer review, this follow-up peer review was conducted secretly and without giving Ramboll the opportunity to address any questions from the peer review panel.  Nonetheless, the follow-up peer review demonstrated that Ramboll had successfully addressed most of the comments on prior versions of

the PBPK model, and EPA's contractor provided Ramboll with a few additional comments that Ramboll believed it could promptly address in a final version of the model.

43.     In addition to providing EPA with the new Ramboll PBPK model, DPE's 2021 Request for Correction also provided EPA with a major new follow-up epidemiological study conducted by Dr. Marsh (Marsh, et al. 2021).  Dr. Marsh's new study provided an update through 2017 regarding the cohort of U.S. chloroprene workers that was the subject of Dr. Marsh's 2007 study (Marsh, et al. 2007a, 2007b).  The updated 2021 Marsh study showed *no increase* in cancer mortalities among U.S. chloroprene workers.

44.     Further, DPE provided EPA with the updated data from the Louisiana Tumor Registry, which, consistent with previous Registry data, indicated lower cancer incidence rates in St. John the Baptist Parish compared to the state average.  The updated 2021 Marsh study included a figure from the Louisiana Tumor Registry website indicating that the cancer incidence rate in St. John the Baptist Parish was below the state average for the 2012-2016 period. (Marsh, et al. 2021 at 10).  A study by Louisiana State University in 2020-2021 confirmed that the Louisiana Tumor Registry had not omitted relevant cancer cases in the 2009-2018 timeframe. Cancer Surveillance Project, *Cancer Reporting in St. John Parish* 3 (2021), https://louisianacancer.org/wp-content/uploads/2021/03/CRISP-Final-Report.pdf.   A recent update of the Louisiana Tumor Registry for the 2015-2019 period also reported that St. John the Baptist Parish was within the bottom 25 percent of cancer incidence rates in Louisiana.  LSU Health, *Louisiana Cancer Data Visualization*, https://sph.lsuhsc.edu/louisiana-tumor-registry/data-usestatistics/louisiana-data-interactive-statistics/louisiana-cancer-data-visualization/ (last visited Jan. 3, 2023).

45.     Like Dr. Marsh's updated epidemiological data, the Louisiana Tumor Registry data strongly support the conclusion that chloroprene does not pose a meaningful risk to humans.  Given

the decades-long history of chloroprene emissions from the Facility (the vast majority of which was under DuPont's ownership and at concentrations more than an order of magnitude higher than current emissions), if EPA's 2010 IUR were remotely accurate, then there would be a statistically significant increase in cancer rates shown in the Louisiana Tumor Registry for St. John the Baptist Parish, and there would be thousands of excess cancer mortalities in the chloroprene worker cohort covered by Dr. Marsh's updated 2021 epidemiological study.  But the empirical data from the Louisiana Tumor Registry and Dr. Marsh's epidemiological study are decidedly to the contrary. The Louisiana Tumor Registry data show that the incidence of cancers near the Facility are at *or below* state-wide averages of cancers of potential concern.  The updated 2021 Marsh study showed *no increase* in cancer mortalities among U.S. chloroprene workers.

G.     EPA Rejects DPE's 2021 Request For Correction, But For A Different And Invalid Reason.

46.     On March 14, 2022, EPA denied DPE's 2021 Request for Correction.  On its face, EPA's alleged justification for denying the 2021 Request for Correction was a complete reversal from EPA's prior denial of the 2017 Request for Correction.  As described above, in denying the 2017 Request for Correction, EPA had taken the position that the 2010 Review (and resulting IUR) could only be changed based on the submission of new scientific evidence.  In the 2021 Request for Correction, DPE did precisely that by providing the new Ramboll PBPK model for chloroprene, further analysis regarding the updated epidemiological study by Dr. Marsh, and epidemiological data from the Louisiana Tumor Registry.  Now, however, in denying the 2021 Request for Correction, EPA took the position that the purpose of the request for correction was to simply correct the analysis and data in the 2010 Review, and not to update the prior risk assessment based on new scientific evidence.  In other words, after EPA faulted DPE for *not* providing new scientific information in the 2017 Request for Correction, EPA now took the

position that the 2021 Request for Correction could not be granted *because DPE had provided new scientific evidence*.  Quite simply, EPA created a "Catch-22" scenario where no revision of an IUR is possible without new scientific evidence, but new scientific evidence will not be permitted to change the IUR.  In short, EPA arbitrarily and capriciously changed its policy for considering new scientific information as set out in the 2018 denial of the 2017 Request for Correction without reasoned explanation.

47.     In denying the 2021 Request for Correction, EPA attempted to insulate itself from judicial scrutiny by providing what it characterized as a "courtesy technical review" of DPE's new scientific evidence.  With a wave of the hand EPA concluded, incorrectly, that even if the new Ramboll PBPK model were appropriate for use for tumor incidence in the lung, in a full risk assessment with the consideration of multiple organs as possible tumor sites, the 2010 IUR would be within a factor of two of the corrected value.  EPA apparently reasoned that the Ramboll PBPK model addresses only lung tumors, when in fact it also provides risk values for the liver.  Using the PBPK values and a full assessment, EPA would have concluded that the 2010 IUR overstates human risk by at least a factor of 35.  Based on its flawed "courtesy" analysis, however, EPA stated that 2010 IUR was in reasonable agreement with potential adjustments using the Ramboll PBPK model.  In addition, the 2022 denial of the 2021 Request for Correction rejected the conclusiveness of new follow-up epidemiological study by Dr. Marsh and the Louisiana Tumor Registry data.

48.     On June 10, 2022, DPE submitted to EPA a Request for Reconsideration of the denial of the 2021 Request for Correction ("2022 Request for Reconsideration").  DPE reiterated all of EPA's errors in the 2010 Review and DPE's arguments and evidence set forth in the 2017 Request for Correction and the 2021 Request for Correction, and DPE urged EPA to reconsider its

rejection of the highly relevant scientific information previously requested by EPA and presented in the 2021 Request for Correction, including the Ramboll PBPK model for chloroprene.

49.     On October 19, 2022, EPA denied DPE's 2022 Request for Reconsideration, thereby affirming EPA's denial of the 2021 Request for Correction.  In its denial, EPA reaffirmed that it has no duty to update the 2010 Review based on current scientific information, stating: "EPA's Information Quality Guidelines recognize that scientific knowledge about chemical hazards and risk changes and may need to be updated over time.  However, the [request for correction] process is not a mechanism to commit EPA to undertake scientific updates of its risk assessment products, such as IRIS Toxicological Reviews."  EPA's denial of the 2022 Request for Reconsideration was a final agency action because it marks the consummation of EPA's decisionmaking process from which legal consequences are presently impacting DPE, as discussed below.

H.     EPA's Actions To Enforce The 0.2 μg/m$^3$  Value Against DPE.

50.     EPA's position on enforcing the 0.2 μg/m$^3$ value as a requirement for chloroprene has undergone a clear change since EPA published the 2011 NATA in December 2015.  For example, in June 2016 EPA, six months after publishing the 2011 NATA, EPA issued an "Action Plan" to DPE and expressed its intent to "collect and evaluate site-specific information" regarding chloroprene emissions.  *See* Action Plan, Denka Performance Elastomer, LLC – Pontchartrain Facility (formerly the DuPont Neoprene Facility, Pontchartrain Works) LaPlace, St. John the Baptist Parish, Louisiana, June 2016, at 1.  At that time, however, EPA expressly recognized that the 2011 NATA should *not* be used "to identify actual exposures and associated risks to specific individuals."  *Id.*  In other words, EPA at that time conceded there was no basis to apply 0.2 μg/m$^3$ as a requirement for chloroprene emissions at the Facility.  As Judge Martin Feldman stated in

*Butler v. Denka Performance Elastomer, LLC,* No. 18-CV-6685, 2020 WL 2747276, 2020 U.S. Dist. LEXIS 91998, *30-32 (E.D. La. May 27, 2020) (Feldman, J.) (quoting EPA.gov), *aff'd in part on other grounds*, 16 F.4th 427 (5th Cir. 2021), the 0.2 μg/m$^3$ value is "less than a federal regulation," "was not designed to pinpoint specific risk values at local levels like St. John the Baptist Parish," and that even the EPA "disclaims" it as an "absolute risk measure of a risk from air toxins."

51.     From June 6-10, 2016, EPA's National Environmental Investigations Center ("NEIC") performed a compliance investigation of the Facility.  *See* NEIC Focused Clean Air Act Compliance Investigation Report, October 2016, at 4.  In so doing, EPA gained further information about the Facility's operations, including chloroprene emissions.

52.     In January 2017, EPA, the Louisiana Department of Environmental Quality ("LDEQ"), and DPE worked together to facilitate the reduction of chloroprene emissions from the Facility.  In January 2017, LDEQ and DPE, with EPA's guidance and support, executed an Administrative Order on Consent ("AOC"), pursuant to which DPE voluntarily reduced chloroprene emissions from the Facility by 85 percent.  To achieve these emission reductions, DPE installed a regenerative thermal oxidizer and other emissions control equipment, at a cost of approximately $35 million.  In May 2020, LDEQ determined that DPE had achieved the agreed-upon 85 percent emission reductions in accordance with the AOC.

53.     On April 24, 2018, EPA presented its findings from the June 2016 NEIC compliance investigation, commencing negotiations between EPA and DPE to resolve such findings (the "NEIC Negotiations").

54.     In September 2019, the Director of EPA's Office of Air Quality Planning and Standards informed LDEQ by letter that the 0.2 μg/m$^3$ value for chloroprene exposure "is not based

on an evaluation of current, real world exposures, is not an air quality standard, and it is not used directly for regulatory purposes.  Furthermore, the risks calculated using the [IUR], such as 100-in-1-million, is not a 'bright line' for determining whether a risk level is considered safe or acceptable."  Letter from P. Tsirigotis (EPA) to Dr. C. Brown (LDEQ), dated Sept. 23, 2019, at 2. In other words, as of September 2019, EPA confirmed that 0.2 $\mu$g/m$^3$ was not a "bright line" standard for determining risk.  EPA further acknowledged that, "in setting emission standards under the Clean Air Act, risk is one factor that we need to consider, along with information on costs, energy, safety, control technologies, and other relevant factors.  And there are many other factors."  *Id.*  However, EPA would soon change that position.  Upon information and belief, EPA did so for political reasons, and not based on any consideration of the latest available science.

55.    When President Biden took office in January 2021, he made clear that "environmental justice" was one of his Administration's highest priorities.  President Biden issued Executive Order 14008, establishing the White House Environmental Justice Interagency Council, the White House Environmental Justice Advisory Council, and the "Justice40 Initiative."[11] Together, these initiatives are designed to identify and advance environmental justice priorities across numerous government agencies and ensure that 40 percent of the benefits of federal investments in clean energy are realized in environmental justice communities.  The executive order also specifically orders the Administrator of EPA to "strengthen enforcement of environmental violations" throughout underserved communities.  *Id.*

---

[11] *See* Exec. Order on Tackling the Climate Crisis at Home and Abroad (Jan. 27, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

56.     Beginning in 2016, based on the 2010 Review, EPA publicly communicated 0.2 $\mu g/m^3$ as the chloroprene concentration level associated with a cancer risk of 100-in-1 million, the risk level generally used by EPA as the "the upper limit of acceptability for purposes of risk-based decisions." *See supra* n. 3.  As a result of those warnings, a group of neighborhood activists and public officials in St. John the Baptist Parish have adopted the slogan "only 0.2 will do," and several toxic tort lawsuits have been filed against DPE either asking the court to order DPE to ensure that off-site concentrations of chloroprene be reduced to below 0.2 $\mu g/m^3$ or seeking monetary damages to compensate the plaintiffs for the fear of contracting cancer after being exposed above the 0.2 $\mu g/m^3$ level.  Notably, roughly 99% of the plaintiffs in these lawsuits do not allege contracting cancer due to chloroprene emissions from the Facility.

57.     In November 2021, EPA Administrator Regan conducted an unprecedented and highly publicized "Journey to Justice Tour" of the American South.  Administrator Regan visited St. John the Baptist Parish and communities in LaPlace, Louisiana in the vicinity of the Facility.  Administrator Regan met with activists in the community who had brought toxic tort lawsuits against DPE seeking damages for alleged harms due to chloroprene emissions and/or the fear of contracting cancer.  On information and belief, the local public's fear of contracting cancer has been fomented by EPA's continued public-facing statements about chloroprene emissions causing cancer and the Facility's emissions causing the "highest NATA-estimated cancer risks nationally."  During his visit to the local community, Administrator Regan declined to meet with DPE or any other industry representative.

58.     On January 24, 2022, Administrator Regan sent a letter to the leadership of DPE's joint venture partners, but not DPE, referring to his 2021 Journey to Justice Tour and visit to St. John the Baptist Parish.  Administrator Regan referred to "the serious risks posed by the

chloroprene emissions resulting from this plant's neoprene manufacturing operations," and essentially adopted the demands of environmental activists and the plaintiffs in the various toxic tort lawsuits pending against DPE. Administrator Regan insisted that DPE take actions to control emissions of chloroprene that go far beyond what is required under EPA regulations and the air permits issued by LDEQ.

59. On February 24, 2022, EPA issued a Request for Information pursuant to Section 3007 of RCRA predicated on information about DPE processes that "have resulted in the release of hazardous air pollutants into the ambient air" ("RCRA Information Request").[12]

60. Following the issuance of the RCRA Information Request, EPA has taken the position with DPE that the Facility must take action to meet the 0.2 $\mu g/m^3$ value, even if the reduction of such emissions is not strictly necessary to bring the DPE facility into compliance or to mitigate excess emissions related to the NEIC investigation.

61. Shortly after the Biden Administration took office, the EPA career staff with whom DPE and Ramboll had collaborated in developing the new PBPK model abruptly ceased engaging in communications with DPE and Ramboll representatives, despite years of  cooperation on the new Ramboll PBPK model. On information and belief, EPA's obvious change in posture was a politically driven decision and EPA staff were encouraged to refrain from further communications with DPE and Ramboll representatives. On information and belief, EPA is not willing to consider the new Ramboll PBPK model for chloroprene and the other updated information presented by DPE in the 2021 Request for Correction because that information undercuts EPA's public pronouncements about the alleged risks of chloroprene in the community and EPA would be

---

[12] Letter from Ms. Cheryl T. Seager, Director, Enforcement and Compliance Assurance Division, EPA Region 6 to Mr. Jorge Lavastida, Executive Officer and Plant Manager, DPE (Feb. 24, 2022).

criticized by environmental activists and the plaintiffs' attorneys in the toxic tort lawsuits pending against DPE.

62.     In early 2022, EPA drastically intensified its campaign against DPE to demand that, based on the 2010 Review and the IUR, the Facility meet 0.2 $\mu g/m^3$ as a requirement for chloroprene concentrations in the surrounding community.  Indeed, without any scientific reason, EPA adjusted the value from 0.2 to 0.20 $\mu g/m^3$, adding a significant figure to the IUR value and thereby making the requirement even more difficult to meet.

63.     Beginning in spring 2022, EPA repeatedly warned DPE that unless DPE agrees to take all actions necessary to meet 0.20 $\mu g/m^3$ for chloroprene emissions, EPA will use "all its tools" to force DPE to do so.  Since that time, EPA has sought to force DPE to implement substantial emissions control projects—which would cost far more than DPE paid to DuPont to acquire the Facility—with the goal of meeting the 0.20 $\mu g/m^3$ value.  At the same time, EPA has acknowledged that DPE is not violating any legal requirement that requires it to meet 0.20 $\mu g/m^3$.  Instead, EPA has informed DPE that it must meet 0.20 $\mu g/m^3$ because of Environmental Justice concerns.  Prior to Administrator Regan's Journey to Justice tour, EPA maintained that achieving a chloroprene concentration of 0.2 $\mu g/m^3$ near the DPE facility was not a goal of the NEIC negotiations.

64.     On May 18, 2022, in a meeting between EPA and DPE representatives, EPA demanded that DPE (i) take immediate action to reduce the Facility's chloroprene concentrations to below 0.20 $\mu g/m^3$; (ii) implement specific emission reduction projects with the goal of meeting 0.20 $\mu g/m^3$; and (iii) commit to further such projects until chloroprene concentrations were below 0.20 $\mu g/m^3$.  EPA has continued to make those demands to the present.

65.     In addition to the demands that EPA has made directly to DPE to meet 0.20 µg/m$^3$, EPA has sought to achieve that goal by pressuring LDEQ to enforce 0.20 µg/m$^3$ as a requirement against the Facility.   On January 20, 2022, the Sierra Club and a neighborhood group filed an administrative complaint with EPA against LDEQ for alleged violations of Title VI of the Civil Rights Act, alleging that LDEQ had discriminated against Black residents of St. John the Baptist Parish by subjecting them to disproportionate air pollution from the Facility ("Title VI Complaint").  The Title VI Complaint alleges that LDEQ has discriminated against these residents by, among other things, failing to review and strengthen the air permits issued to the Facility and failing to control chloroprene emissions from the Facility.

66.     Under the federal civil rights laws and EPA's nondiscrimination regulations, the EPA External Civil Rights Compliance Office ("ECRCO") investigated the Title VI Complaint and has implemented procedures to attempt to informally resolve the matter with LDEQ.

67.     On October 12, 2022, EPA sent a "letter of concern" to LDEQ regarding the Title VI Complaint ("October 12 Letter").   Referring to the 2010 Review, the October 12 Letter asserts that "[c]hloroprene was identified by EPA as a likely carcinogen twelve years ago, in 2010, and since that time, both EPA's and LDEQ's understanding of the exposures and consequently the risks that chloroprene emissions pose to exposed populations in Louisiana have evolved."   The October 12 Letter "recommends" that LDEQ immediately (i) conduct a cumulative impact analysis of the neighboring community; (ii) monitor area chloroprene concentrations based on the 0.20 µg/m$^3$ value; (iii) issue renewed air permits to the Facility only "after completion of the cumulative impact analysis"; and (iv) "work to establish limits in Industrial Corridor air permits [including the Facility's air permits] that, in the aggregate, limit air emissions of carcinogens that have a mutagenic mode of action, including chloroprene."   The October 12 Letter further states that

"[g]iven the long history of exposure in the area, the goal is to limit future air emissions of such pollutants to levels consistent with cancer risks below 100-in-1 million (based on 70 years of exposure) at sites where people live, and to reduce concentrations of such carcinogens even further if reasonably achievable."  In other words, EPA's goal is to require the Facility to meet 0.20 $\mu g/m^3$ and EPA is effectively pressuring LDEQ to enforce the 0.20 $\mu g/m^3$ value against the Facility.

### FIRST CLAIM FOR RELIEF

**(Defendants' Issuance Of The 2010 Review Was Arbitrary, Capricious, An Abuse Of Discretion, And Contrary To Law In Violation Of The APA)**

68.     DPE incorporates paragraphs 1-67 as if fully set forth herein.

69.     Defendants' issuance and application of the 2010 Review setting a 0.2 $\mu g/m^3$ 1-in-10,000 risk-based value for chloroprene was arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA, because Defendants failed to consider the best available scientific data despite concerns raised by qualified peer reviewers.

70.     In setting that stringent 0.2 $\mu g/m^3$ risk-based value for chloroprene, EPA erroneously relied upon a default assumption that humans are as sensitive to chloroprene as a female B6C3F1 mouse.  This was a fundamental error by EPA, as the 2010 peer reviewers of the 2010 Review expressly informed EPA at the time.  Because of the substantial toxicokinetic differences between the female B6C3F1 mouse and humans—differences which EPA was aware of but did not account for in its calculation of the IUR—the IUR dramatically overstates the human cancer risks associated with exposure to chloroprene.  EPA knew this and disregarded the scientific information that demonstrated it.

71.     The 2010 peer reviewers emphasized to EPA that the IUR applicable to the female B6C3F1 mouse was not appropriate for assessing the risks of chloroprene exposure to humans, and that EPA should develop an accurate PBPK model to correctly assess how animal risk studies

translate into potential human risk.  EPA was arbitrary and capricious in failing to develop and rely upon a PBPK model in issuing the 2010 Review setting the stringent 0.2 μg/m$^3$ IUR value for chloroprene.

72.     The 2010 peer review also strongly criticized EPA's misuse of the relevant epidemiological data in the 2010 Review, including the most robust epidemiological studies.  EPA was arbitrary and capricious in refusing to revisit its analysis of the existing epidemiological studies or reconsidering its own analysis of the available data.

73.     The above-referenced information constituted the best scientific data available to EPA at the time of its decision and relevant to assessing the potential risk of chloroprene to humans.   As such, EPA was obligated to consider this information in the 2010 Review.  Defendants' failure to do so, resulting in the setting of a 0.2 μg/m$^3$ IUR value for chloroprene, was arbitrary, capricious, an abuse of discretion, and not in accordance with law, because Defendants failed to consider the best available scientific data in violation of the APA.

## SECOND CLAIM FOR RELIEF

**(Defendants' Denials Of DPE's Challenges To The 2010 Review Were Arbitrary, Capricious, An Abuse Of Discretion, And Contrary To Law In Violation Of The APA)**

74.     DPE incorporates paragraphs 1-73 as if fully set forth herein.

75.     In DPE's 2017 Request for Correction, 2018 Request for Reconsideration, 2021 Request for Correction, and 2022 Request for Reconsideration, DPE challenged EPA's issuance of the 2010 Review resulting in the setting of a 0.2 μg/m$^3$ IUR value for chloroprene.  EPA's denial of DPE's challenges—affirming the 0.2 μg/m$^3$ IUR value for chloroprene—was arbitrary, capricious, an abuse of discretion, and not in accordance with law, because Defendants failed to consider the best scientific data available to EPA at the time of its decision in violation of the APA.

76.     In the 2017 Request for Correction and 2021 Request for Correction, DPE pointed out EPA's errors in issuing the 2010 Review and setting a 0.2 μg/m$^3$ IUR value for chloroprene, including EPA's flawed reliance on the default assumption that humans are as sensitive to chloroprene as a female B6C3F1 mouse.  DPE further pointed out the substantial criticisms of the 2010 Review by the 2010 peer reviewers, including EPA's failure to utilize a PBPK model and EPA's misuse of the relevant epidemiological data in the 2010 Review.

77.     In rejecting the 2021 Request for Correction and 2022 Request for Reconsideration, in particular, Defendants erred and abused their discretion by failing to consider and rely upon the new Ramboll PBPK model for chloroprene presented as part of the 2021 Request for Correction and 2022 Request for Reconsideration.  The Ramboll PBPK model for chloroprene—which was fully peer-reviewed, including by EPA's own sponsored peer review—would allow EPA to correctly assess how animal risk studies translate into potential human risk.  The Ramboll PBPK study is the best available science to correctly assess how animal risk studies translate into potential human risk.  Defendants erred and abused their discretion by failing to fully consider and rely upon the Ramboll PBPK model and by disregarding the Ramboll PBPK model in rejecting the 2021 Request for Correction and 2022 Request for Reconsideration.

78.     Further, in rejecting the 2021 Request for Correction and 2022 Request for Reconsideration, Defendants erred and abused their discretion by failing to consider and rely upon the most recent and robust epidemiological data, including Dr. Marsh's 2021 epidemiological study showing no increase in cancers among U.S. chloroprene workers, and the empirical data from the Louisiana Tumor Registry showing that the incidence of cancers near the Facility are at or below state-wide averages of cancers of potential concern.

79.     The above-referenced information constitutes the best available scientific data relevant to assessing the potential risk of chloroprene to humans.  As such, Defendants were obligated to consider and rely upon this information in the 2010 Review and should have revisited that information based on the facts and arguments set forth in the 2017 Request for Correction, the 2018 Request for Reconsideration, the 2021 Request for Correction, and the 2022 Request for Reconsideration.  Defendants' repeated failure to do so, resulting in the setting of a 0.2 $\mu g/m^3$ IUR value for chloroprene, was arbitrary, capricious, an abuse of discretion, and not in accordance with law, because Defendants failed to consider the best available scientific data in violation of the APA.

80.     Defendants' current and ongoing application of the 2010 Review to DPE through the 0.20 $\mu g/m^3$ IUR value for chloroprene without providing a rational basis for the Agency's failure to consider the best available scientific data—including the Ramboll PBPK model, Dr. Marsh's 2021 epidemiology study, and the 2022 Louisiana Tumor Registry data—is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

### THIRD CLAIM FOR RELIEF

**(Defendants' Abrupt Change Of Position—Refusing To Consider The Ramboll PBPK Model After Encouraging And Working With DPE To Develop It—Was Arbitrary, Capricious, An Abuse Of Discretion, And Contrary To Law In Violation Of The APA)**

81.     DPE incorporates paragraphs 1–80 as if fully set forth herein.

82.     In denying DPE's 2017 Request for Correction, EPA stated repeatedly that DPE had failed to provide new scientific evidence to dispute, among other things, EPA's reliance on the female B6C3F1 mouse in setting the human IUR for chloroprene.  Based on EPA's articulated position, DPE, through Ramboll, spent three years developing an updated and peer reviewed PBPK model for chloroprene.

83.     EPA actively collaborated with DPE and Ramboll in developing the new and improved Ramboll PBPK model for chloroprene.  EPA commented on Ramboll's work plan for the development of a PBPK model and, on information and belief, EPA committed substantial resources to provide Ramboll with quality assurance guidance on the development of the PBPK model.  In meetings and emails between EPA and DPE/Ramboll, EPA personnel repeatedly emphasized that DPE and Ramboll should develop the PBPK model.

84.     In June 2019, to ensure that the new PBPK model was correct, Ramboll subjected the PBPK model to a peer review and ultimately published the model.  In October 2020, EPA itself sponsored another peer review of an updated version of the Ramboll PBPK model, resulting in further improvements to the model.

85.     By early 2021, having now developed, with EPA's collaboration, the very new scientific information that EPA had said was necessary to revisit and reassess the IUR for chloroprene, DPE submitted the 2021 Request for Correction highlighting the new scientific information that was now available, including the Ramboll PBPK model for chloroprene.

86.     In rejecting the Ramboll PBPK model as part of the denial of the 2021 Request for Correction and 2022 Request for Reconsideration, Defendants' position regarding the model was a complete reversal from the position EPA had taken with respect to the 2017 Request for Correction.  In rejecting the 2017 Request for Correction, EPA faulted DPE for not providing new scientific information.  Now, in rejecting the 2021 Request for Correction and 2022 Request for Reconsideration, Defendants have taken the position that EPA would not revisit the 2010 Review *because* DPE had provided new scientific evidence.

87.     Defendants' abrupt reversal of position was not based on the evidence, data, or best scientific information available at that time.  Upon information and belief, Defendants' reversal was done for political reasons, and not based on any consideration of the best available science.

88.     Defendants' reversal of position, effectively creating Catch-22 scenario, was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and resulted in Defendants failing to consider the best available scientific data in violation of the APA.

## FOURTH CLAIM FOR RELIEF

**(Defendants' Reversal Of EPA's Longstanding Risk Assessment Policy Without Reasoned Explanation Was Arbitrary, Capricious, An Abuse Of Discretion, And Contrary To Law In Violation Of The APA)**

DPE incorporates paragraphs 1–88 as if fully set forth herein.

89.     Defendants have arbitrarily and capriciously reversed 30 years of EPA risk assessment policy without reasoned explanation by treating an estimated 1-in-10,000 risk based on the 2010 IUR in a strict, "bright line" fashion.

90.     EPA has a history of setting long-term risk standards greater than 1-in-10,000. Under Section 112 (f) of the Clean Air Act, 42 U.S.C. § 7412(f), EPA sets emission standards for hazardous air pollutants, such as chloroprene, with a statutorily required "ample margin of safety" to protect public health.  EPA regulations have authorized long-term risks of greater than 1-in-10,000 in the following regulations:

- In 1989, EPA established National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for benzene, 54 Fed. Reg. 38044 (Sept. 14, 1989), based on a risk assessment accepted by Congress and codified in the Clean Air Act in 42 U.S.C. § 7412(f)(2)(B). For Coke By-Product Recovery Plant, the benzene NESHAPs authorized a maximum risk of 2-in-10,000.

- In 2005, in the NESHAPs for Coke Oven Batteries, EPA authorized a risk of 2.7-in-10,000. 70 Fed. Reg. 19992 (2005).

- In 2006, in the National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities, EPA authorized a risk of 2-in-10,000. 71 Fed. Reg. 42723 (2006).

- In 2021, in the NESHAPs for Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, EPA authorized a risk of 2-in-10,000. 85 Fed. Reg. 49084 (2020).

91.     EPA's departure from 30 years of Agency risk assessment policy without reasoned explanation was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA.

**RELIEF REQUESTED**

For the reasons set forth above, DPE respectfully requests that the Court grant the following relief:

1.      A judicial declaration that Defendants' issuance of the 2010 Review setting a 0.2 $\mu g/m^3$ IUR value for chloroprene, was arbitrary, capricious, an abuse of discretion, and not in accordance with law, because Defendants failed to consider the best scientific data available at that time in violation of the APA.

2.      A judicial declaration that Defendants' denial of DPE's 2017 Request for Correction, 2021 Request for Correction, and 2022 Request for Reconsideration—challenging the issuance of the 2010 Review setting a 0.2 $\mu g/m^3$ IUR value for chloroprene—was arbitrary, capricious, an abuse of discretion, and not in accordance with law, because Defendants failed to consider the best scientific data available at that time in violation of the APA.

3.      An order remanding the 2010 Review to EPA and requiring Defendants to give full consideration to the best available scientific information regarding the inhalation unit risk of chloroprene to humans, including the Ramboll PBPK model and the latest epidemiological data.

4.      An order permanently enjoining Defendants from relying upon the 2010 Review in its current form and from applying the 0.20 $\mu g/m^3$ value for chloroprene unless and until EPA has

fully considered the best available scientific information regarding the potential risk of chloroprene

to humans.

     5.      An order granting all such other relief as the Court deems appropriate.

Dated:  January 11, 2023

Respectfully submitted,


*/s/ Robert E. Holden*
JONES WALKER LLP

David A. Super (*pro hac* to be filed)
Jason B. Hutt (*pro hac* to be filed)
Jeffrey R. Holmstead (*pro hac* to be filed)    James C. Percy (La. Bar No. 10413)
Kevin M. Voelkel (*pro hac* to be filed)    445 N. Boulevard, Suite 800
BRACEWELL LLP    Baton Rouge, Louisiana 70802
2001 M Street NW, Ste. 900    Telephone: (225) 248-2130
Washington, DC 20006    Facsimile:  (225) 248-3130
(202) 828-5800    jpercy@joneswalker.com
david.super@bracewell.com
jason.hutt@bracewell.com    Robert E. Holden (La. Bar. No. 06935), T.A.
jeff.holmstead@bracewell.com    Brett S. Venn (La. Bar. No. 32954)
kevin.voelkel@bracewell.com    201 St. Charles Ave., Suite 5100
    New Orleans, LA 70170
    Telephone: (504) 582-8000
    Facsimile: (504) 582-8583
    bholden@joneswalker.com
    bvenn@joneswalker.com


***Counsel for Plaintiff***
***Denka Performance Elastomer, LLC***